

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 07 2018

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR
## THE EASTERN DISTRICT OF ARKANSAS

JERRI PLUMMER                                                    PLAINTIFF

Vs.                     CASE NO. 4:18-CV-00063-JM

RHETT MCSWEENY;
DAVID LANGEVIN;
MCSWEENY LANGEVIN, LLC;
WHITNEY SHOEMAKER, DO;
WOMEN'S HEALTH AND SURGERY CENTER, LLC;
PLAINTIFF FUNDING HOLDING INC., D/B/A/ LAWCASH;
VINCENT CHHABRA;
MICHAEL CHHABRA;
LAW FIRM HEADQUARTERS, LLC.;
SURGICAL ASSISTANCE, INC;
WESLEY BLAKE BARBER;
KASIA OSADZINSKA, M.D.;
ALPHA LAW, LLP.;
RICHARD MARTINDALE;
RON LASORSA;
DIANE SUGIMOTO; and
JOHN DOES 1-97                                                  DEFENDANTS

### FIRST AMENDED COMPLAINT

Comes now the Plaintiff, Jerri Plummer, by and through her attorneys, the Baxter Law

firm and Ellis Law Firm, P.A., and for her first amended complaint herein alleges and states:

### INTRODUCTION

1. This cause of action stems from a deep-running conspiracy to turn a potentially

   defective medical product into a cash cow for a wide range of people including

   lawyers, doctors, and investors, but unfortunately not for the women who had the

   potentially defective medical product installed inside of their bodies.  In fact, the

   result of this scheme left these women as victims of an extraneous invasive medical

procedure that exacerbated their existing medical problems and with little or no compensation for the harm done.

2. This is an action for professional negligence, breach of fiduciary duty, civil conspiracy, deceptive trade practices, and declaratory judgment under Arkansas law.

## **PARTIES**

3. Plaintiff Jerri Plummer ("Jerri") is, and at all times relevant hereto, was a resident of Saline County, Arkansas.

4. Based upon information and belief, Defendant Rhett McSweeney is a resident of the state of Minnesota. Likewise, Defendant McSweeney is a licensed attorney in the state of Minnesota. Rhett McSweeney has validly waived service of process in this action through his attorneys.

5. Based upon information and belief, Defendant David Langevin is a resident of the state of Minnesota. Likewise, Defendant Langevin is a licensed attorney in the state of Minnesota. David Langevin has validly waived serve of process in this action through his attorneys.

6. Based upon information and belief, Defendant McSweeney-Langevin, LLC ("McSweeney/Langevin"), is a limited liability company organized under the laws of Minnesota with all of its members being residents of Minnesota. Both Defendants Rhett McSweeney and David Langevin are members and agents of McSweeney/Langevin, LLC. McSweeney/Langevin has been validly served with process of this action.

7. Based upon information and belief, Defendant Richard Martindale is a resident of Washington, D.C. or the state of Texas. Likewise, Defendant Martindale is a licensed attorney in the state of Texas and in Washington, D.C.

8. Based upon information and belief, Defendant Alpha Law LLP ("Alpha Law"), is a limited liability partnership formed under the laws of the District of Columbia with all of its members being residents of states other than Arkansas. Further, based upon information and belief, Alpha Law can be served through its registered agent in the District of Columbia, Lonny Bramzon, Esq., 1201 L Street NW, Suite 800, Washington, District of Columbia 20037.

9. Based upon information and belief, Defendant Whitney Shoemaker is a resident of Florida.

10. Based upon information and belief, Defendant Women's Health and Surgery Center, LLC ("Women's Health and Surgery"), is a limited liability company organized under the laws of Florida with all of its members being residents of Florida. Women's Health and Surgery has been validly served with process in this action.

11. Based upon information and belief, Defendant, Plaintiff Funding Holding, Inc., is a corporation organized under the laws of Delaware with its principle place of business in New York. Further, Plaintiff Funding Holding, Inc., does business as "LawCash." Plaintiff Funding Holding, Inc. (hereinafter referred to as "LawCash"), can be served through its agent of service with the Delaware Secretary of State, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

12. Based upon information and belief, Defendant Vincent Chhabra is a resident of the state of Florida.

13. Based upon information and belief, Defendant Michael Chhabra is a resident of the state of Florida.

14. Based upon information and belief, Defendant Ron Lasorsa is a resident of the state of Florida.

15. Based upon information and belief, Law Firm Headquarters, LLC ("Law Firm Headquarters"), is a limited liability company organized under the laws of Florida with all its members being residents of the state of Florida. Likewise, based upon information and belief, both Defendants Michael Chhabra and Vincent Chhabra are believed to be members and agents of Law Firm Headquarters, which is their alter ego. Law Firm Headquarters was validly served with process of this action on December 12, 2017.

16. Based upon information and belief, Defendant Surgical Assistance, Inc. is a dissolved Florida Corporation. Surgical Assistance can be served through its registered agent of service, MDJD Marketing and Management Consultants, Inc, at 8815 Conroy Winderemere Rd., Suite 171, Orlando, Florida 32835.

17. Based upon information and belief, Defendant Wesley Blake Barber ("Mr. Barber") is a resident of the state of Florida.

18. Based upon information and belief, Defendant Kasia Osadzinska, M.D. is a resident of the state of Florida.

19. Based upon information and belief, Defendant Diane Sugimoto, is a resident of the state of Florida.

## JURISDICTION AND VENUE

20.  Rhett McSweeney, David Langevin, McSweeney/Langevin, Richard Martindale, and Alpha Law have all been counsel for the Plaintiff in a claim against Boston Scientific regarding potentially defective transvaginal mesh. Jerri is a resident of Arkansas. The mesh in question was implanted in Arkansas. Likewise, Jerri's claim for personal injury in which the above-mentioned attorneys represented her arises under Arkansas law. Further, McSweeney/Langevin advertises that they handle claims in Arkansas.[1] Additionally, as detailed later in Complaint, all of the Defendants engaged in a conspiratorial relationship to have Jerri, a resident of Arkansas, leave Arkansas and travel to Florida in order to receive unnecessary medical treatment for the sole purpose of increasing the value of her case to them, and thus increase their profits.

21.  Also, LawCash is in the business of lending money to people with personal injury claims. LawCash lends money to people with personal injury claims in Arkansas, and LawCash specifically loaned money to Jerri secured by an interest in her potential personal injury claim against Boston Scientific while Jerri was a resident of Arkansas. In fact, the contractual document that Jerri executed with LawCash was executed by her in the state of Arkansas. Jerri's claims against LawCash relate to this loan funding relationship. Moreover, Jerri was referred to LawCash by Surgical Assistance, Mr. Barber, and Law Firm Headquarters.

22.  Furthermore, Defendant Law Firm Headquarters was in the business of soliciting potential vaginal mesh clients for Alpha Law and McSweeney/Langevin. They likewise managed parts of the clients' cases that they generated for Alpha Law and

---

[1] www.westrikeback.com (accessed October 29, 2017) (stating "[o]ur dangerous and defective medical device attorneys handle cases throughout the entire United States:...Arkansas...").

McSweeney/Langevin.  At all times in their solicitation and management of clients, they were agents of McSweeney/Langevin, Rhett McSweeney, David Langevin, Richard Martindale, and Alpha Law.[2]

23.   Law Firm Headquarters, McSweeney/Langevin, Rhett McSweeney, David Langevin, Richard Martindale, Ron Lasorsa, Diane Sugimoto, and Alpha Law caused Jerri to be the recipient of a telephonic cold call in which employees and agents of Law Firm Headquarters had the intent to sign Jerri up for legal representation with Alpha Law and McSweeney/Langevin.  Further, Law Firm Headquarters, in coordination with Surgical Assistance and Mr. Barber, fraudulently convinced Jerri, while she was in and a resident of the state of Arkansas, that she needed to have her Boston Scientific vaginal tape removed in Florida.

24.   Law Firm Headquarters, Surgical Assistance, and Mr. Barber helped plan and coordinate Jerri's eventual mesh removal in Orlando, Florida, and even helped plan and coordinate Jerri's travel to the state of Florida.

25.   Defendant Women's Health and Surgery is a medical provider that provides medical services to residents of Arkansas.  In fact, Women's Health and Surgery provided medical services to Jerri, a resident of Arkansas.  Likewise, based upon information and belief, Women's Health and Surgery, in coordination with Surgical Assistance, Mr.

---

[2] See In Re, American Medical Systems, 2:212-md-02325, Brief in Support of Motion to Quash ECF Doc. No. 2206 at 3 (S.D. West Virginia 2017) (stating that Law Firm Headquarters "...has provided traditional legal support services to [Alpha Law and McSweeney/Langevin] separately, as the **agent of each.** Pursuant to separate agreements with each of the Law Firms, [Law Firm Headquarters] provided marketing assistance, prospective client screening, assistance with due diligence on claim validity, client care services, and data management, among other services.  The Law Firms instructed and supervised these functions on the Law Firm's behalf."  See also Id. at 12 (stating that Law Firm Headquarters "served as an agent in communicating with clients and prospective clients..." on behalf of lawfirms).

Barber, and Law Firm Headquarters, helped plan, coordinate, arrange, and even fund Jerri's travel from Arkansas to Florida for her operation.

26. Defendant Kasia Osanzinska, M.D., and Whitney Shoemaker, D.O., are medical care providers in the state of Florida. They treat residents of Arkansas, and in fact treated Jerri, a resident of Arkansas. Based upon information and belief, Kasia Osanzinska, M.D., and Whitney Shoemaker, D.O., also participated in the conspiracy to bring Jerri to Florida in order to have the mesh removed without it being medically necessary.

27. Thus, all the Defendants have minimum contacts with the state of Arkansas and this cause of action is directly related to those contacts. Therefore, personal jurisdiction is proper in this Court.

28. This Court also has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332.

29. Venue is also proper in this Court as this case was removed to this Court.

## FACTUAL ALLEGATIONS

30. Jerri never graduated high school and has very little education. This fact left Jerri vulnerable to the fraudulent, evil, and unconscionable acts of many in this case.

31. On June 13, 2008, Jerri underwent a transvaginal mesh tape operation where Boston Scientific transvaginal tape was implanted in her body. This procedure took place at Saline Memorial Hospital in Benton, Arkansas, under the care and guidance of Dr. David Caldwell, M.D., a local board certified OBGYN.

32. At some point thereafter it was discovered that the vaginal tape or mesh that was implanted in Jerri was **possibly** defective.

33. Based upon information and belief, Vincent Chhabra, Michael Chhabra, Diane Sugimoto, and Ron Lasorsa violated HIPPA laws and discovered that Jerri had possibly defective Boston Scientific tape implanted in her.

34. Subsequently, Law Firm Headquarters, or more likely its offshore call center in India, at the direction of Vincent Chhabra, Michael Chhabra, Diane Sugimoto and Ron Lasorsa, cold called Jerri in late October of 2014 acting under the guise of "Medical Associates" and encouraged Jerri to hire attorneys and pursue a claim against Boston Scientific for the potentially defective transvaginal mesh. Several calls like this took place thereafter. All of the later calls occurred in November 2014. Some of the later calls involved the Defendant Surgical Assistance acting under Defendant Mr. Barber.

35. In these calls, rather than advising Jerri of the truth, which was that her transvaginal mesh was **potentially** defective, they purposely lied and asserted to Jerri that her mesh was absolutely defective, and that if she did not have it removed it could potentially kill her. They also advised Jerri that she could make a great sum of money in pursuing a claim against Boston Scientific through one of their partner attorneys. Likewise, they lied and advised Jerri that she would need to have the mesh removed by a physician in Florida because no other physician close to Jerri performed such an operation.

36. Jerri, believing these false representations that her Boston Scientific transvaginal mesh was defective and could possibly kill her, agreed to allow the callers to refer her to a lawyer and medical provider.

37. The entire reason that these entities lied to Jerri about the necessity of her mesh removal was because if she had the mesh removed her case would be more valuable

to Vincent Chhabra, Michael Chhabra, Diane Sugimoto, Ron Lasorsa, Rhett McSweeney, David Langevin, Richard Martindale, Alpha Law, and McSweeney/Langevin. Also, if Jerri had the operation through these entities, Surgical Assistance and Mr. Barber would receive a kickback from the medical providers in Florida.

38. Likewise, they lied to Jerri about the need to go to Florida because the Chhabra's, Diane Sugimoto, and Ron Lasorsa, through Surgical Assistance and Mr. Barber, had a relationship and an understanding with Women's Health and Surgery in which they knew that Women's Health and Surgery and its physicians would perform the mesh removal without regard to whether the removal was medically prudent or necessary. In exchange, Law Firm Headquarters, through lies and fraud, would convince women like Jerri that they needed to obtain loans in order to pay the full amount of the billing to Women's Health and Surgery rather than submitting a claim through insurance, Medicare, or Medicaid.[3]

39. Further, the Chhabra's, Diane Sugimoto, Ron Lasorsa, McSweeney/Langevin, Alpha Law, Women's Health and Surgery, Surgical Assistance, and Mr. Barber had a relationship with LawCash whereby they would put any ethical and professional judgment aside and arrange and coordinate for their clients/patients to secure

---

[3] This allowed Women's Health and Surgery to charge significantly more for its services and facilities. In Jerri's case, Jerri paid approximately $21,000 for the procedure to Women's Health and Surgery, when it would have cost between approximately $589.35 and $993.33 had the procedure been processed through Jerri's Medicaid. Likewise, based upon information and belief, Defendant Shoemaker was individually paid around $3,500 for the procedure from Women's Health and Surgery, whereas she would have only been paid approximately $500 had the procedure been processed through Jerri's Medicaid.

funding from LawCash at staggeringly high interest rates (43% per annum in Jerri's case) secured on their claims against Boston Scientific.

40. LawCash or its agents, after gaining a referral of susceptible prey for its unconscionable and usurious[4] lending practices, would give Mr. Barber and Surgical Assistance a referral fee.

41. Besides Mr. Barber's kickbacks, the Chhabra's, Diane Sugimoto, Ron Lasorsa, McSweeney/Langevin, Alpha Law, and Women's Health and Surgery's purpose behind this referral program with LawCash was to obtain money to ensure Women's Health and Surgery could be paid the exorbitant full extent of its billing so that its physicians would continue to perform unnecessary procedures, thus increasing the value of the cases of all associated with Alpha law and McSweeney/Langevin. LawCash's purpose was to make phenomenal sums of money by taking almost all of the client's/patient's share of her claim against Boston Scientific. LawCash knew it could do this because the lawyers representing the clients would not bring usury claims and would lie in stating they clearly explained the terms of the LawCash agreement to their client, when in fact they had not.

42. This is exactly what occurred with Jerri. After Jerri fell for the lie that she must have her mesh removed, in face of her potential death, she consented to traveling to Florida and having the mesh removed at Women's Health and Surgery, allowing the callers to arrange it. Likewise, after believing the lie that she must go to Florida to have the mesh removed because no physician close to her could perform the procedure, Jerri

---

[4] A court in New York has specifically found LawCash's staggeringly high interest rates to be usurious under New York Law. 1. See *Echeverria v. Estate of Lindner*, 7 Misc.3d 1019(A), 801 N.Y.S.2d 233 (Sup. Ct. 2005), judgment entered sub nom. *Echeverria v. Estate of Lindner* (N.Y. Sup. Ct. Mar. 18, 2005).

consented to having Law Firm Headquarters and Surgical Assistance arrange a loan with LawCash to pay for the operation. Jerri's loan with LawCash was for the full amount of the surgery with Women's Health and Surgery, $21,000.00 with an interest rate of approximately 43% per annum, and was secured by her claim against Boston Scientific. Based on information and belief, Defendant Mr. Barber and Surgical Assistance received a kick back from LawCash for successfully having Jerri agree to its malevolent lending agreement.

43. Jerri's mesh removal surgery was scheduled for December 12, 2014, at Women's Health and Surgery in Clermont, Florida by Whitney Shoemaker, D.O.[5] This was scheduled by agents of Law Firm Headquarters in coordination with LawCash, Alpha Law, and McSweeney/Langevin.

44. In fact, Jerri's legal case against Boston Scientific was initially referred to Alpha Law by Law Firm Headquarters. Alpha Law is a law firm organized by Defendant Richard Martindale and of which Defendant Michael Chhabra (CEO of Law Firm Headquarters) and Defendants Ron Lasorsa and Diane Sugimoto were members, with Michael being the majority owner. LawCash also had a representative hold an ownership stake in Alpha Law to ensure that their investments were safeguarded and that no one challenged their usurious practice. However, by November 14, 2014, Jerri's claim was assigned to McSweeney/Langevin, and McSweeney/Langevin was aware of this assignment.

---

[5] Jerri's pre-surgical clearance records report that she was seen at Women's Health and Surgery. Her operative note states that the operation took place at Clermont Ambulatory Surgical Center, but all of the billing for the surgery was billed through Defendant Women's Health and Surgery.

45. By November 14, 2014, McSweeney/Langevin, Rhett McSweeney, and David Langevin were aware that Jerri was going to have an operation removing her mesh at Women's Health and Surgery, and that LawCash would be funding the entire cost of the procedure without anything being billed to insurance, Medicaid, or Medicare.

46. Likewise, by December 4, 2014, McSweeney/Langevin, Rhett McSweeney, and David Langevin knew that the LawCash funding agreement required an attorney to acknowledge that they received a copy of the LawCash agreement and that they read it to and "explained the terms to [their client]."

47. Jerri signed a written contract with McSweeney/Langevin and Alpha Law on December 8, 2017. Jerri agreed to the contract, which stated she would pay an attorneys fee of 45%, plus costs, and even interest on the cost. This is a staggering fee. Likewise, the contract stipulated that Jerri would allow disputes to be handled by arbitration in Washington, D.C. Jerri did not and does not have the money to travel to Washington, D.C., much less fund an arbitration. Jerri did not consult with outside counsel about entering into this agreement, and McSweeney/Langevin gave her no disclosures about the risks and cost of arbitration. Additionally, the contract attempted to limit McSweeney/Langevin's liability prospectively, which is a clear violation of the Model Rules of Professional conduct since they did not make Jerri receive advice from outside counsel.

48. Jerri's operation took place on December 12, 2014, after she had signed both a letter of protection in favor of Women's Health and Surgery, and the LawCash funding agreement. However, Jerri signed both documents without first consulting an attorney. This was due to the fact that no one from McSweeney/Langevin contacted

Jerri about the LawCash agreement or about the surgery, even though they were aware in November that Jerri would be having the surgery and that the procedure was to be funded by LawCash.

49. David Langevin signed the LawCash "attorney acknowledgement" for Jerri on December 5, 2014 – three days after Jerri had the operation done. Langevin signed the document stating he had explained the terms of the LawCash agreement to Jerri, when in fact no explanation ever took place.

50. Based upon information and belief, LawCash did not pay for Jerri's operation until David Langevin signed this form. In other words, Jerri had already been operated on, and when there was no need to secure the funding, Langvin signed a form securing the funding. It is clear that David Langevin did this to keep his conspiratorial relationship viable with both the doctors and LawCash. In fact, Langevin has a long history of signing LawCash agreements after his clients had had surgeries done in order to keep everyone in the money-making scheme happy.

51. Moreover, contrary to Jerri's best interest, she had the operation done with little to no diagnostic testing by Shoemaker or Women's Health and Surgery.

52. In fact, the only testing that appears to have taken place was making sure Jerri was cleared for surgery. There was no testing whatsoever that occurred for the purpose of determining whether surgery was in Jerri's best interest. Jerri's surgical clearance was performed on December 11, 2014 by a general surgeon, who was not a specialist in vaginal mesh/tape removal.

53. In fact, the first time that Jerri talked to Defendant Shoemaker – the surgeon removing Jerri's tape – was in the operating room. This is because the conspiratorial

relationship and agreement foreclosed the need to make sure the surgery was medically necessary.

54.  The fact that Jerri was made to travel to Florida is even more staggering considering the fact that she had an OBGYN physician in Arkansas that could have performed this operation – in the case that Jerri actually needed it done.  Likewise, said physician could have performed the procedure by billing Medicaid rather than the full amount of the bill.  But Jerri's physician in Arkansas had medical and professional ethics and was not a part of the Chhabra machine.  This prevented anyone, even her attorneys with a strong fiduciary duty towards Jerri, from recommending that she not travel all the way to Florida to have the procedure done.

55.  Unsurprisingly, the removal surgery that she received has caused Jerri substantial medical problems.  For example, she now has no bladder or bowel control.  These issues did not exist prior to the operation to remove the mesh/tape.

56.  Based upon information and belief, it was against Jerri's best interest for the tape/mesh to be removed, and any reasonable doctor would not have proceeded with the operation.

57.  In short, it would have been in Jerri's best interest to see a local OBGYN to determine whether she needed the transvaginal mesh/tape removed.  Instead, Jerri was told that Boston Scientific's tape/mesh was defective, was told if she did not get the mesh/tape removed she might die, and was convinced that she had to travel to a D.O. several states away, who then, in turn, performed an operation that was medically unnecessary at an exorbitant rate.  Jerri's staggeringly high bills were paid off by McSweeney/Langevin securing a loan with LawCash.  In securing the loan, David

Langevin signed the LawCash document stating that he read Jerri the agreement, when in fact, he had no such conversation with Jerri.

## COUNT I: FRAUD

58. The Plaintiff re-alleges and incorporates all of the allegations made in paragraphs 1-56 as set forth word-for-word.

59. Defendants Law Firm Headquarters and Surgical Assistance, under the direction of Vincent Chhabra, Michael Chhabra, Diane Sugimoto, Ron Lasorsa, and Blake Barber fraudulently told Jerri that she needed to have her Boston Scientific mesh/tape removed or else she could die.

60. This representation was a false representation of material fact, as Jerri would have been better off without having the mesh removed, and she certainly would not have died as a result of the mesh.

61. Likewise, these representations were made without enough information to support them. Law Firm Headquarters, Surgical Assistance, Vincent Chhabra, Michael Chhabra, Diane Sugimoto, Ron Lasorsa, and Blake Barber knew there was insufficient evidence to support these representations, as they knew they were not doctors and that no medical professional had evaluated Jerri's needs.

62. These representations were made with the intent to induce Jerri into the surgery, as that was the entire goal of the many conspirators.

63. Jerri reasonably relied upon these representations to her detriment, as she is now sufficiently worse after having the surgery.

64. This fraud was an intentional and malicious act for which punitive damages should lie.

65. The above-mentioned conduct also constitutes constructive fraud.

66. Likewise, these representations were made by agents of Rhett McSweeney, David Langevin, Richard Martindale, Alpha Law, and McSweeney/Langevin within the course and scope of their agency and employment. Thus, Rhett McSweeney, David Langevin, Richard Martindale, Alpha Law, and McSweeney/Langevin should be vicariously liable for this fraud as well.

### COUNT II: CONSTRUCTIVE FRAUD AND BREACH OF FIDUCIARY DUTY AGAINST SHOEMAKER AND OSADZINSKA

67. The Plaintiff incorporates, reasserts, and re-alleges all of her allegations as set forth in paragraphs 1-65 of her complaint.

68. Defendants Osadzinska and Shoemaker both participated in what they called medical treatment of Jerri Plummer. Osadzinska did a pre-surgical clearance and Shoemaker performed the operation.

69. Thus, they owed Jerri a fiduciary duty of loyalty, competence, and candor.

70. By clearing Jerri for surgery, and actually performing the surgery, these Defendants made representations that the surgery was in Jerri's best interest when it indeed was not.

71. Likewise, both Defendants knew that Jerri was paying an exorbitant rate for this surgery, and they knew that she could have obtained the surgery (if it was actually needed) with another physician by billing Medicaid. However, both Defendants said nothing to Jerri in an effort to deepen their pockets.

72. Thus, these Defendants committed constructive fraud as well as a breach of their fiduciary duty toward their patient.

## COUNT III: ATTORNEY PROFESSIONAL NEGLIGENCE

73. The Plaintiff incorporates, re-alleges, and reasserts all allegations set forth in paragraphs 1-71 of her complaint.

74. Rhett McSweeney, David Langevin, Richard Martindale, and their employees and agents, including Law Firm Headquarters and Surgical Assistance, were not medical experts, yet they were advising clients on medical matters. This was done out of pure greed, because if Jerri had the surgery, her case would be of greater value to these entities and individuals. Thus, Jerri was convinced to have the extraneous operation by agents of lawyers who were simply trying to cash a big check, without the slightest regard for their client's health and well-being. Moreover, Jerri was swindled into an agreement for a loan at a staggering 43% interest rate, again only to keep relationships alive between this group of health-abusing conspirators.

75. First, a competent and reasonable attorney in the community would never have allowed their agents to refer Jerri to a physician several states away when she had an adequate physician in Arkansas, where she lived. Likewise, a competent and reasonable attorney in the community would have advised their client against taking such an action once they had discovered what was happening, which Rhett McSweeney, David Langevin, and McSweeney/Langevin undoubtedly knew by November 14, 2014. Yet here, Rhett McSweeney, David Langevin, and McSweeney/Langevin stood by and allowed Jerri to travel several states away to have an unneeded surgery at the hands of a known incompetent medical staff, all while

paying for the exorbitant bill by taking out a secured loan at a staggeringly high interest rate.

76. Jerri was able to go ahead with the surgery without truly appreciating if it was in her best interest. This can be seen in the fact that they flew Jerri down to Florida to have the operation without first conducting any tests or screenings, and Jerri relied solely on the false representation that she needed to have the mesh removed. It can also be seen from the fact that Shoemaker and Women's Health and Surgery wanted to avoid billing it to Jerri's Medicaid, and thus prevent going through the review process, and instead opted to do a letter of protection. A competent and reasonable attorney would have advised Jerri against all of this, yet Rhett McSweeney, David Langevin, and Richard Martindale did nothing.

77. Third, a competent and reasonable attorney would not have allowed their client to go into a physician that was charging the full contractual amount when their client had Medicaid that could have paid for the operation.

78. Fourth, a competent and reasonable attorney certainly would not have referred and allowed their client to finance the surgery at a 43% interest rate – especially after the client already had the procedure done.

79. All of Jerri's attorneys failed to act as reasonably competent attorneys in the community would act. Thus, Rhett McSweeney, David Langevin, Richard Martindale, McSweeney/Langevin, and Alpha Law breached their duty of representation to Jerri.

80. Moreover, the breach of this duty actually and proximately caused damages to Jerri.

81. These facts also show that Rhett McSweeney, David Langevin, Richard Martindale, McSweeney/Langevin, and Alpha Law all breached their fiduciary duty of loyalty and

competency to Jerri as well.  This breach also actually and proximately caused Jerri substantial damages.

82. Moreover, all of the Defendants mentioned in this count should have known that the natural and probable result of their egregious actions herein complained of would be severe personal injury to Jerri, yet they acted in a willful and wanton manner in a disregard to Jerri's health and well-being.  Thus, punitive damages should lie.

### COUNT IV: CIVIL CONSPIRACY

83. The Plaintiff incorporates, re-alleges, and reasserts all of her allegations in paragraphs 1-81 of her complaint.

84. Here, there was a combination of persons, including Rhett McSweeney, David Langevin, Richard Martindale, Whitney Shoemaker, Vincent Chhabra, Michael Chhabra, Ron Lasorsa, Diane Sugimoto, Blake Barber, Surgical Assistance, Law Firm Headquarters, Alpha Law, McSweeney/Langevin, and Women's Health and Surgery who had a referral agreement that was immoral and oppressive to the client/patient, in order to make their respective pockets much deeper.  Likewise, convincing Jerri that she needed surgery was done in an immoral and oppressive way.

85. Thus, all of the Defendants have committed the tort of civil conspiracy that actually and proximately caused severe damages to Jerri.

86. Moreover, this conspiracy is an intentional act without regard to the health and well-being of others.  Likewise, all of the named Defendants in this count knew, or should have known, that the natural and probable result of their actions would be severe personal injury.  However, they acted willfully and wantonly in a reckless disregard.  Thus, punitive damages should lie.

87. Judgment against all conspirators should be rendered jointly and severally.

### COUNT V: VIOLATIONS OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT

88. The Plaintiff incorporates, re-alleges, and reasserts all of her allegations in paragraphs 1-86 of her complaint.

89. The actions of all of the Defendants, save Boston Scientific, also violate Ark. Code Ann. § 4-88-107(8) and (10).  This is because it is a deceptive and unconscionable trade practice to convince a woman, who is in a compromised position due to a lack of education, that she needs to have surgery without any prescreening, and then proceed to charge her the full amount of the billing rather than submitting the claim to Medicaid.  All of the Defendants or their agents, acting within the course and scope of their agency, were involved in this deception.

90. These violations to the Arkansas Deceptive Trade Practices Act caused substantial damages to Jerri.

91. Likewise, Jerri should be awarded reasonable attorney's fees for her prosecution of this action under the Arkansas Deceptive Trade Practices act.

### COUNT IV: PROFESSIONAL NEGLIGENCE AGAINST SHOEMAKER AND OSADZINSKA

92. The Plaintiff incorporates, re-alleges, and reasserts all of her allegations in paragraphs 1-90 of her complaint.

93. A reasonable and competent physician in the community would not have recommended the mesh removal surgery for Jerri, nor would they have cleared Jerri for such surgery.

94. Both Defendants Shoemaker and Osadzinska breached this duty to Jerri.

95. This action would have been brought at an earlier time, and within the applicable two-year statute of limitations for medical injury, but the wrongfulness of Shoemaker and Osadzinska's actions were fraudulently concealed not only by false representations made by both Defendants that the surgery was needed, but also by the false representations made by agents acting on the Defendants' behalf that Jerri needed the surgery or could face death. Only in the last few months did Jerri discover these falsehoods. That is a reasonable amount of time to make such a discovery considering Jerri's lack of education, the extent of the conspiratorial lies, and other circumstances.

## COUNT VII: UNJUST ENRICHMENT BY SHOEMAKER, WOMEN'S HEALTH AND SURGERY, BLAKE BARBER, AND SURGICAL ASSISTANCE

96. The Plaintiff incorporates, re-alleges, and reasserts all of her allegations set forth in paragraphs 1-98.

97. Based upon information and belief, Defendants Shoemaker and Women's Health and Surgery made a substantial amount of money helping in the events that caused Jerri to have the extraneous surgery. Even if Jerri needed to have such a surgery, they made too much money because they could have billed Jerri's Medicaid. There was no reason for Jerri's Medicaid not to have been charged.

98. Likewise, based upon information and belief, Defendants Barber and Surgical Assistance made a profit due to their fraudulent behavior by getting a kick back from Women's Health and Surgery and/or Shoemaker.

99. Thus, it is clear that Defendants Shoemaker, Women's Health and Surgery, Blake Barber, and Surgical Assistance have been unjustly enriched as equity, morality, and good conscience dictate that they not be able to retain the money made as a product

of their fraudulent actions in convincing Jerri to have done an unneeded surgery, and certainly not keep money in excess of what Medicaid would have charged.

## COUNT VIII: DECLARATORY RELIEF AGAINST MCSWEENEY/LANGEVIN AND ALPHA LAW

100. Plaintiff incorporates, re-alleges, and reasserts all of her allegations in paragraphs 1-98 of her complaint.

101. The Court should declare that Jerri's contract with Alpha Law and McSweeney/Langevin is not valid as it was not entered into by all parties, as McSweeney/Langevin nor Alpha law signed the contract. Alternatively, the contract is void in its entirety due to lack of mutuality, fraud, unconscionability, and undue influence.

102. Likewise, the Court should declare that the arbitration and mediation provision in the contract is null and void due to the fact that neither McSweeney/Langevin nor Alpha Law ever advised Jerri to get advice from outside counsel on these provisions. Additionally, no one from either McSweeney/Langevin or Alpha Law (who were supposed to be acting as Jerri's attorneys in a fiduciary capacity) made any attempt to explain to Jerri what these provisions entailed or meant. Likewise, Jerri should be excused from these provisions due to the doctrines of unconscionability, unilateral mistake, and impossibility of performance.

103. This Court should also declare the choice of law provision in the contract as null and void, because the contract is null and void in its entirety, and also because D.C law has no reasonable relationship to the parties. Alpha Law's D.C. presence exists merely to allow fraudulent non-lawyers (i.e. Vincent Chhabra, Michael Chhabra,

Diane Sugimoto, and Ron Lasorsa) to own a piece of the conspiratorial machine's theoretical pie (i.e. the cases they obtained by cold calling and lying).

104.     Likewise, the Court should declare null and void any language in the contract that attempts to prospectively relieve the firms and attorneys therein from liability as a gross violation of public policy, as enshrined in the Arkansas Rules of Professional Conduct.

105.     Since this count sounds in contract, the Plaintiff should be awarded a reasonable attorney fee.

## COUNT IX: DECLARATORY JUDGMENT AGAINST LAWCASH

106.     The Plaintiff incorporates, re-alleges, and reasserts all of her allegations in paragraphs 1-104 of her complaint.

107.     This Court should declare Jerri's contract with LawCash as null and void under the Arkansas Declaratory Judgment Act, because the contract was entered into under fraudulent representations by agents of LawCash, and because no attorney explained the provisions of the contract to Jerri – a material condition upon the contract's existence.

108.     Likewise, in the alternative, the Court should declare that the contract with LawCash is usurious under both New York and Arkansas law.

109.     Since this count sounds in contract, the Plaintiff should be awarded a reasonable attorney fee.

## DAMAGES

110.     The actions and/or inactions of all of the Defendants acting alone and jointly

proximately caused the damages, injuries, and enhanced injuries.  Plaintiff seeks

compensation for the following elements of damage under Arkansas Law:

(a) Excruciating pain and suffering;
(b) Mental anguish and distress;
(c) Past and future medical expenses;
(d) Disfigurement;
(e) Past and future loss of earnings and earning capacity;
(f) Loss of household services;
(g) Unjust enrichment[6];
(h) Punitive damages;
(i) A reasonable attorneys fee;
(j) Her costs; and
(k) All other general and special damages to which she is entitled to under
    Arkansas law.

Jerri does not yet know the measure of her damages, but she believes them to be in

excess of Five Million Dollars ($5,000,000.00) in compensatory damages and Ten

Million Dollars ($10,000,000.00) in punitive damages.

### **RIGHT TO AMEND**

111.     The Plaintiff believes she is at the punishing end of a deep and multi-faceted

conspiracy designed to benefit at her expense.  While there has been diligent research

put forth to date in hopes of uncovering this conspiracy, the Plaintiff believes she has

yet to uncover all of the actors involved.

112.     Thus, actors involved with the actions and inactions herein complained of

should take notice that if they were not named in this complaint, it was by mistake

within the meaning of Rule 15 of the Arkansas Rules of Civil Procedure.

---

[6] This element of damages is sought solely from Defendant Shoemaker, Women's Health and Surgery,
Blake Barber, and Surgical Assistance.

113.    Further, the Plaintiff has named John Does 1-99 as Defendants and reserves

the right to amend and add these Defendants once their identities become known.

Again, their identities remain unknown despite diligent inquiry as set forth in the

affidavit of counsel – please see attached as Exhibit A.

WHEREFORE, Plaintiff, Jerri Plummer, prays that she be awarded judgment as set

forth above, jointly and severally, in an amount to be determined by the Court, but in an

amount greater than that required for federal diversity jurisdictional purposes; her costs

herein including a reasonable attorney's fee; and all other just and proper relief to which she

may be entitled.

Dated this 6th Day of February, 2018.

RESPECTFULLY SUBMITTED,

Ray Baxter, Ark. Bar No. 78012
James R. Baxter, Ark. Bar No. 2017191
The Baxter Law Firm
3115 Alcoa Road
Benton, AR 72015
PH:    501-315-2971
FX:    501-712-2856
Email: raybaxterpa@gmail.com

And

George D. "Bucky" Ellis, Ark. Bar No. 72035
126 N. Main Street
Benton, AR 72015
PH:    501-315-1000
FX:    501-315-4222
Email: gellisinbenton@swbell.net

**CERTIFICATE OF SERVICE**

I, do hereby certify that a copy of the foregoing will be served on all counsel of

record via this Court's CM/ECF system contemporaneously with its filing.

/s/ Ray Baxter

Excerpts from ALI *Principles of the Law of Family Dissolution*
Domestic Partners

## § 6.03 Determination That Persons Are Domestic Partners

(1) For the purpose of defining relationships to which this Chapter applies, domestic partners are two persons of the same or opposite sex, not married to one another, who for a significant period of time share a primary residence and a life together as a couple.

(2) Persons are domestic partners when they have maintained a common household, as defined in Paragraph (4), with their common child, as defined in Paragraph (5), for a continuous period that equals or exceeds a duration, called the *cohabitation parenting period,* set in a rule of statewide application.

(3) Persons not related by blood or adoption are presumed to be domestic partners when they have maintained a common household, as defined in Paragraph (4), for a continuous period that equals or exceeds a duration, called the *cohabitation period,* set in a rule of statewide application. The presumption is rebuttable by evidence that the parties did not share life together as a couple, as defined by Paragraph (7).

(4) Persons *maintain a common household* when they share a primary residence only with each other and family members; or when, if they share a household with other unrelated persons, they act jointly, rather than as individuals, with respect to management of the household.

(5) Persons have a *common child* when each is either the child's legal parent or parent by estoppel, as defined by § 2.03.

(6) When the requirements of Paragraph (2) or (3) are not satisfied, a person asserting a claim under this Chapter bears the burden of proving that for a significant period of time the parties shared a primary residence and a life together as a couple, as defined in Paragraph (7). Whether a period of time is significant is determined in light of all the Paragraph (7) circumstances of the parties' relationship and, particularly, the extent to which those circumstances wrought change in the life of one or both parties.

(7) Whether persons share a life together as a couple is determined by reference to all the circumstances, including:
    (a) the oral or written statements or promises made to one another, or representations jointly made to third parties, regarding their relationship;
    (b) the extent to which the parties intermingled their finances;
    (c) the extent to which their relationship fostered the parties' economic interdependence, or the economic dependence of one party upon the other;
    (d) the extent to which the parties engaged in conduct and assumed specialized or collaborative roles in furtherance of their life together;

(e) the extent to which the relationship wrought change in the life of either or both parties;

(f) the extent to which the parties acknowledged responsibilities to each other, as by naming the other the beneficiary of life insurance or of a testamentary instrument, or as eligible to receive benefits under an employee-benefit plan;

(g) the extent to which the parties' relationship was treated by the parties as qualitatively distinct from the relationship either party had with any other person;

(h) the emotional or physical intimacy of the parties' relationship;

(i) the parties' community reputation as a couple;

(j) the parties' participation in a commitment ceremony or registration as a domestic partnership;

(k) the parties' participation in a void or voidable marriage that, under applicable law, does not give rise to the economic incidents of marriage;

(l) the parties' procreation of, adoption of, or joint assumption of parental functions toward a child;

(m) the parties' maintenance of a common household, as defined by Paragraph (4).

## § 6.04 Domestic-Partnership Property Defined

(1) Except as provided in Paragraph (3) of this section, property is domestic-partnership property if it would be marital property under Chapter 4, had the domestic partners been married to one another during the domestic-partnership period.

(2) The domestic-partnership period

(a) starts when the domestic partners began sharing a primary residence, unless either partner shows that the parties did not begin sharing life together as a couple until a later date, in which case the domestic-partnership period starts on that later date, and

(b) ends when the parties ceased sharing a primary residence.

For the purpose of this Paragraph, parties who are the biological parents of a common child began sharing life together as a couple no later than the date on which their common child was conceived.

(3) Property that would be recharacterized as marital property under § 4.12 if the parties had been married is not domestic-partnership property.

## § 6.05 Allocation of Domestic-Partnership Property

Domestic-partnership property should be divided according to the principles set forth for the division of marital property in § 4.09 and § 4.10.

## § 6.06 Compensatory Payments

(1) Except as otherwise provided in this section,

(a) a domestic partner is entitled to compensatory payments on the same basis as a spouse under Chapter 5, and

(b) wherever a rule implementing a Chapter 5 principle makes the duration of the marriage a relevant factor, the application of that principle in this Chapter should instead employ the duration of the domestic-partnership period, as defined in § 6.04(2).

(2) No claim arises under this section against a domestic partner who is neither a legal parent nor a parent by estoppel (as defined in § 2.03) of a child whose care provides the basis of the claim.

# EXHIBIT A

DocuSign Envelope ID: 0BBFCD81-3125-490C-B101-217166965A77

12/8/14

## CONTINGENCY FEE RETAINER AGREEMENT

This Contingency Fee Retainer Agreement is made by __Jerri Plummer__
("Client") who desires to retain Alpha Law LLP ("Alpha"), a law firm organized under the laws of the District of Columbia as a limited liability partnership, and McSweeney/Langevin LLC ("McSweeney"), together referred to as "Counsel".

## I.   SCOPE OF SERVICES

**A.** Client agrees to retain Counsel as its attorney(s)-in-fact in Client's matter regarding liability / personal injury / or wrongful death claim against the manufacturers and/or distributors of a Trans-Vaginal Mesh ("TVM Case").

**B.** Counsel's representation of client is limited to recovering damages or other compensatory property or services for Client in Client's specific TVM Case.

**C.** Client represents and warrants as a matter of fact that he/she has not filed and resolved a TVM Case (whether by settlement, judgment, trial, or abandonment), and is not currently represented by another law firm(s) in prosecuting any TVM Case. Client further understands that Counsel is entering into this Agreement in specific and general reliance on the foregoing representation of fact.

## II.   LEGAL FEES AND COSTS

**A. Contingent Fee:** Client hereby agrees to pay Counsel, jointly, a contingent fee of forty percent (40%) of the Gross Recovery to Client if the case is resolved prior to filing the lawsuit; and shall be forty-five (45%) of the Gross Recovery to Client thereafter. "Gross Recovery" is calculated as the value of all moneys, services or remedial conduct recovered for the client, regardless of how characterized (e.g., whether characterized as damages, injunctive relief, constructive trust, monitoring services, remediation, revision surgery, restitution, offset, reimbursement, or attorneys' fees). Gross Recovery is calculated separately and shall be deducted from the total amount apart from the costs that are deducted. "Contingent Fee" in this Agreement means that **IF THERE IS NO RECOVERY, NO ATTORNEY FEE WILL BE PAID AND NO COSTS OR EXPENSES WILL BE CHARGED.**

**B. Costs and Expenses:** Counsel will likely incur various costs and expenses in performing legal services under this Agreement. Costs and expenses shall include, but are not limited to, litigation expenses such as filing fees, service fees, depositions, mediation and/or arbitration fees, expert and lay witness fees, investigative services, costs of obtaining and copying medical records and reports, cost of trial exhibits, outside legal fees and costs incurred for estate, guardianship, bankruptcy and probate matters, and all other costs and expenses necessary for adequate performance of legal services on Client's behalf. Costs shall also include but not be limited to administrative costs such as photocopies, facsimiles, local and long-distance telephone calls, postage fees and other overnight delivery service charges; reasonable interest on all expenses that are advanced (not to exceed the "prime" rate published in the Wall Street Journal); and travel costs such as out-of-

1

DocuSign Envelope ID: 0BBFCD81-3125-490C-B101-217166965A77

town hotel, food and transportation. In the event of a recovery, Client agrees to pay in full, or reimburse Counsel in full for advancing any and all costs, disbursements and/or expenses paid, owed by you, or incurred by Counsel on Client's behalf in connection with this matter, including any interest accrued as a result of advancing costs, disbursements and/or expenses paid. The advancement of costs and expenses is not required but is discretionary on Counsel's part. **COSTS AND EXPENSES WILL BE DEDUCTED FROM ANY RECOVERY SEPARATELY FROM, AND IN ADDITION TO, ATTORNEYS' FEES BUT WILL NOT BE CHARGED IF THERE IS NO RECOVERY.**

C. **Alternative Fee Arrangement.** Client understands and acknowledges that he/she may choose to pay Counsel an hourly, rather than a contingency fee. Client also understands and acknowledges that he/she can choose to advance the costs and expenses listed in Section II.B. above, in lieu of incurring any interest associated with those costs and expenses. By signing this Agreement Client waives the alternative of an hourly fee payment option and also waives the advancement of costs and expenses to avoid any interest payments. Client understands that he/she has the right to contact Counsel prior to signing this Agreement to discuss any alternate fee arrangement, whether it is specifically set forth herein or not.

D. **Reimbursement Pro Rata of General Costs:** Costs shall also include general product liability/personal injury litigation costs and expenses incurred by Counsel. General product liability litigation costs and expenses shall include, but are not limited to, any costs which are not incurred solely for the benefit of, or as a result of Client's TVM Case, but which are incurred for the benefit of all litigation cases in which Counsel are retained or are counsel of record. To the extent such are incurred, Client agrees to pay a pro rata share of all such costs incurred prior to the receipt of proceeds from defendants by way of settlement or satisfaction of a judgment. Client's pro rata share shall be determined by dividing the gross proceeds of any settlement or satisfaction of judgment to be received by all clients, by the total gross settlement proceeds of all product liability/personal injury or wrongful death litigation in which Counsel are retained or are counsel of record, and multiplying that fraction by the total of all general product liability/personal injury litigation costs incurred as of the date monies are distributed from the settlement, or satisfaction of judgment regarding Client's claim.

E. **Federal MDL or Coordination or State Coordination Fees:** In the event there is a court ordered assessment or agreement for fees and costs to be paid to any current or future Federal Multi-district Litigation (MDL) or Federal coordinated proceedings or any State Court coordinated proceedings, this fee and/or cost agreement/assessment, which typically ranges from 6% to 9% of the gross proceeds, will be deducted **pursuant to the order of the Court**, from Client's share of the recovery and will not affect the fees and costs to be paid or reimbursed to Counsel. At this time, Counsel cannot determine what fees and costs, if any, will be paid to any of the coordinated litigations.

DocuSign Envelope ID: 0BBFCD81-3125-490C-B101-217166965A77

**III.   NO MEDICAL MALPRACTICE CLAIMS**

Client hereby warrants, acknowledge and agrees that Counsel has <u>not</u> been retained to investigate any allegations of medical malpractice and will not pursue any claims of any nature whatsoever against any of Client's healthcare providers under this Agreement. Client understand that Counsel have not and will not provide Client with any legal advice regarding commencing or foregoing the opportunity to bring suit any legal action, if any legal action exists against Client's healthcare providers

**IV.   MEDICAL EXPENSES**

**A.** If Client's claim includes reimbursement for medical expenses incurred in treating the injury, which is the basis of this claim, Client may, by contract or statute, be required to repay to the party who paid the medical expenses part or all of those amounts (i.e. subrogation). This is Client's obligation, and such repayment, if any, shall be Client's responsibility and shall be paid out of Client's settlement proceeds.

**B.** If a dispute arises between Client and a subrogee or lien holder and the Counsel has notice of such dispute, Client agrees to allow Counsel to hold the maximum amount being claimed in an escrow account until such dispute has been resolved. Counsel is authorized to attempt to negotiate a reduction of such liens or to retain a legal specialist to negotiate a reduction, which shall be a reimbursable cost of litigation. Payments for all such known and/or negotiated liens shall be made by Counsel out of any recovery, and shall be deducted after attorneys' fees and costs have been deducted.

**V.   FILING SUIT & STATUTE OF LIMITATIONS**

**A. Discretion to File Suit.** Counsel is hereby authorized to bring suit when and in any matter Counsel deems advisable that does not prejudice Client's rights.

**B. Statute of Limitations.** Client may be precluded from filing a claim based upon the running of the statute of limitations, depending on the Client's state of residence, the location of the litigation, and other factors. Client acknowledges that Counsel cannot determine whether Client's statute of limitations has run until complete investigation is concluded after Counsel receives all of Client's medical records. Client hereby waives any and all complaints, grievances, claims and causes of action against Counsel for failing to file suit prior to the running of Client's statute of limitations *unless* Client's statute of limitations is scheduled to run on or after the 61st day after Counsel receives Client's complete, certified file. *IF CLIENT BELIEVES THAT IT MAY SOON HAVE A CLAIM PRECLUDED BY THE STATUTE OF LIMITATIONS, CLIENT IS INSTRUCTED TO CALL COUNSEL IMMEDIATELY TO DISCUSS SAME <u>BEFORE</u> SIGNING THIS AGREEMENT AND TO ONLY SIGN THIS AGREEMENT UPON APPROVAL OF COUNSEL.*

DocuSign Envelope ID: 0BBFCD81-3125-490C-B101-217166965A77

## VI.   ATTORNEY'S AUTHORITY & POWER OF ATTORNEY

**A.** In connection with the claims covered by this Agreement, Client hereby appoints Counsel as its attorney-in-fact with power of attorney and all necessary authority to execute and endorse any and all orders and other papers which Client could properly execute or endorse, to receive on Client's behalf any monies or other things of value to which Client may be entitled because of any judgment recovered or any settlement received, and to endorse and /or execute on Client's behalf any checks or drafts issued or made in connection with Client's matter.

**B.** Client understands that Counsel will not settle any matter without Client's expressed consent.

## VII.   ASSOCIATION AND PAYMENT OF OTHER ATTORNEYS

In connection with the claims covered by this Agreement, Client recognizes that Counsel may associate with other attorneys and may enter into a contract in which Counsel may agree to share fees and/or legal-related expenses with these other attorneys. This association of other attorneys or legal professionals shall not increase the amount of attorney fees paid by Client. Client also authorizes Counsel to reach an agreement with referring attorneys and associated attorneys to share the attorneys' fees paid pursuant to agreement at the percentage or hourly rate Counsel negotiates and agrees with such other attorneys. The precise amount of total fees paid to each attorney will be set forth within the distribution statement(s) prepared when Client's case is resolved, and Client agrees that at that time Client will acknowledge said fee-sharing amounts and agree to them by Client's acceptance of the terms of the distribution of Client's settlement or judgment proceeds. At this time, Alpha and McSweeney have entered into an agreement to share the legal fees on the following schedule: Alpha Law LLP: 85% and McSweeney/Langevin LLC: 15%.

## VIII.   ASSIGNMENT & LIEN

Client hereby assigns Counsel an interest in Client's case, equal to the then-applicable contingency percentage, of Client's case, and irrevocably grants Counsel a lien on any and all proceeds from claims or causes of action that are subject to our or our related entities and affiliates representation under this Agreement. Counsel's lien will be for any sums owing to Counsel for any costs and interest or attorney fees at the conclusion of our services. The lien will automatically attach to any recovery Client may obtain by any of means such as arbitration award, judgment, appeal, settlement or otherwise.

## IX.   WITHDRAWAL/TERMINATION

Counsel may withdraw from Client's representation at any time, upon reasonable written notice to Client at Client's last known address. If Client discharges Counsel, or if Counsel withdraws for cause, client agrees to pay Counsel a reasonable attorney fee and non-reimbursed costs. The attorneys' fee shall be, Counsel's option, either (a) an amount equal to the number of hours expended by Counsel multiplied by Counsel's rate of $475.00 per hour and administrative time expended at rates no more $95.00 per hour; or (b) a prorated portion of the contingent fee ultimately recovered based on relative contributions to the case Attorney and any successor law firm as determined by the law of *quantum meruit*.

4

DocuSign Envelope ID: 0BBFCD81-3125-490C-B101-217166965A77

**X.    DISCLAIMER OF GUARANTEE**

Nothing in this Agreement and nothing in our written or verbal statements to Client are intended to be, and shall not be construed as, a promise or guarantee regarding any outcome of Client's matter. Counsel makes no promises or guarantees regarding Client's case and its potential or expected outcome. There can be no assurance that Client will recover any sum or sums in this matter. Any comments or statements by Counsel about the value of Client's claims or the outcome of Client's matter are probabilistic expressions of Counsel's opinion only and shall not be construed as promises or guarantees regarding any resolution of Client's case. Client hereby represents and warrants that Client is not relying any such promise, representation of opinion in choosing to sign this Agreement.

**XI.    AGGREGATE SETTLEMENTS**

In certain cases the defendant or defendants in Client's TVM Case may attempt or be forced to settle with multiple similarly situated plaintiffs. In such circumstances, there exists a potential conflict of interest whenever a lawyer represents many individual plaintiffs in a group settlement of this type because it necessitates choices concerning the allocation of limited settlement amounts among the multiple plaintiffs. However, if all clients consent, a group settlement can be accomplished and a single offer can be fairly distributed among the clients by allocating settlement amounts to plaintiffs' individual cases based upon the strengths and weaknesses of each case, the relative nature, severity and extent of injuries, and individual case evaluations. In the event of a group or aggregate settlement proposal, Counsel will work with an independent person or third party to implement a settlement program/grid, overseen by an independent party, designed to ensure consistency and fairness for all claimants, and which will assign various settlement values and amounts to each plaintiff's case depending upon the facts and circumstances of each individual case. Client hereby authorizes Counsel to enter into and engage in settlement discussions and agreements, which may include Client's individual claims within a larger group settlement effort, under the proviso that Client will have option of opting out of that process should Client choose to at a later juncture.

**XII.    GENERAL.**

   **A.   Freedom to Contract.** Client understands that Client has the freedom to bargain for and negotiate any of the terms of this Agreement or to consult with or retain any attorneys of Client's choice.

   **B.   Governing Law.** Client understands that this Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to the District of Columbia's choice of law rules.

   **C.   Alternate Dispute Resolution.** Client agrees that, in part to protect Client's own confidentiality and privileged information, that Client and Counsel agree to resolve any potential disputes via resort to confidential meditation within 60 days of such dispute. Client and Counsel both agree that they will file no suit and/or grievance with any public body or court, and that any statute of limitations shall be deemed tolled pending said mediation. If the mediation process does not resolve the issue,

DocuSign Envelope ID: 0BBFCD81-3125-490C-B101-217166965A77

then Client and Counsel agree to submit their dispute to binding arbitration in Washington D.C. before JAMS. CLIENT HEREBY ACKNOWLEDGES THAT ARBITRATION IS CLIENT'S ONLY RECOURSE AND THAT CLIENT WAIVES CLIENT'S RIGHT TO TRIAL BY JURY AND TO JUDICIAL APPEAL BY SIGNING THIS AGREEMENT. Client further waives any right to bring any claim in a representative action or "class action." This clause alone shall be construed under and consistent with the American Arbitration Act.

   **D.** Client and Counsel may sign this Agreement via electronic signature.

**ATTESTATION: "I REPRESENT THAT I HAVE READ AND FULLY UNDERSTAND THIS AGREEMENT,** and voluntarily agree with all provisions. By signing this Agreement I acknowledge the above."

Signed by CLIENT:                                          Alpha Law LLP:

12/8/2014 | 4:14:58 PM ET
_____            _____
Date                                                       Date

Jerri Plummer
_____            _____
Print Client's Name                                   Print Name

_____            _____
Client's Signature                                    By Firm Attorney

McSweeney/Langevin LLC:

_____
Date

_____
Print Name

_____
By Firm Attorney

6

# EXHIBIT B

DocuSign Envelope ID: F4C776E6-2757-4A66-9631-DCDFB27CDAFC

## PLAINTIFF FUNDING HOLDING INC. FUNDING AGREEMENT

This Funding Agreement, made as of December 08, 2014, is between Jerri Plummer, residing at 1222 Cherry Lane , Benton, Arkansas 72015- (hereinafter referred to as "I"), and Plaintiff Funding Holding Inc. having its principal place of business at 26 Court Street, 11th Floor, Brooklyn, New York 11242-0000 (hereinafter referred to as ("LAWCASH").

### · RECITALS

A. I am currently engaged in a pending legal claim and/or lawsuit as a result of injuries arising out of a personal injury claim defined as Jerri Plummer for the incident that occurred on or about 06/13/2008, or any other related actions, (hereinafter referred to as "Lawsuit") or any other related action which shall include, without limitation, any lawsuits or claims in which I am asserting my right to recovery for my injury, whether it is against the defendants named in the lawsuits, or others, and shall include any claims I may or will have for the handling of my original claim or lawsuit.

B. I have been advised by LAWCASH to discuss this matter with my attorney and/or such other legal counsel of my own choosing prior to signing this Agreement and that I have either received such counsel or expressly waived it.

C. You have advised me to assess all of my alternatives to funding my immediate economic needs prior to accepting this funding. Because LAWCASH is taking a high risk in giving me this funding, I understand that LAWCASH may make a large profit. However, LAWCASH will be paid only from the proceeds of the Lawsuit, and agrees not to seek money from me directly in the event that the Lawsuit is not successful. I will use the proceeds advanced to me for any life needs only.

D. This Funding Agreement and all of its principal terms have been fully explained to me, and all questions that I might have about this transaction have been fully explained to me in English or such other language that I speak best.

E. I represent that there are no pending tax claims nor are there any pending criminal allegation(s) or charge(s) against me.

### SECTION I. FULL DISCLOSURE

| | |
|---|---|
| Total to be advanced to me under THIS agreement: | **$21,000.00** |
| Total to be advanced to me under ALL agreements: | **$21,000.00** |
| Case Monitoring Fee (total of all fundings): | **$100.00** |
| Application Fee (total of all fundings): | **$250.00** * |

Total amount to be repaid by me under ALL agreements:

| Date of Payment to LAWCASH | Amount Due |
|---|---|
| If payment is made on 06/02/2015 | $25,844.79 |
| If payment is made on 12/02/2015 | $31,318.17 |
| If payment is made on 06/02/2016 | $37,950.92 |
| If payment is made on 12/02/2016 ** | $45,987.95 |

*   Other fees may apply as per agreement but are not anticipated at the time of funding.
**  This chart includes example dates only. Dates in-between and after those shown may reflect other pay-off amounts.   Always contact LAWCASH for your exact pay-off amount.

Client's Initials JP

DocuSign Envelope ID: F4C776E6-2757-4A66-9631-DCDFB27CDAFC

## SECTION 2. FUNDING AND REPAYMENT TERMS

1.  In consideration for the receipt of the sum of twenty-one thousand and xx / 100 dollars ($21,000.00) from LAWCASH, I am assigning an interest equal to the funded amount, together with several use fees, compounded monthly, and other fees or costs, from the proceeds of my lawsuit to LAWCASH. The monthly use fee shall be a charge in an amount equal to 3.70% monthly of the amount funded to me herein. This funded amount includes the Application Fee that I agreed to when first applying for this funding. (Together, this makes my total funded amount $21,350.00.) In the event that any funding is repaid with proceeds within the first 3 months, the pay-off amount will be computed as if it were repaid at the end of that period. The monthly use fee is charged from this date until the end of the 6 month interval during which payment of proceeds is made to LAWCASH. In the case of multiple fundings, then these fees shall accrue on each funded sum from the date of each individual funding. These amounts will be deducted from the proceeds of my lawsuit. If I do not recover any money from my lawsuit, I will not owe LAWCASH anything. If I recover money from my lawsuit, which is insufficient to pay the full amount due to LAWCASH, then LAWCASH's recovery will be limited to the proceeds of the lawsuit.

2.  I hereby direct said amount to be distributed as follows: $21,000.00 payable to Women's Health & Surgery Center, LL.

3.  I understand and agree that any funds that you advance to me for the purpose of receiving any medical treatment of any kind, including but not limited to surgery, physical therapy or psychological treatments or therapy, shall be returned to you immediately in the event that I opt not to undergo such treatment for any reason whatsoever. Under these limited circumstances, I will remain indebted to you for the return of these funds, together with all appurtenant costs and fees regardless of the outcome of my Lawsuit.

4.  Before re-paying you, I instruct my attorney to verify the full payment balance owed. I understand that should my attorney, any payer or I send you a check for less than the sum actually due in pay-off of my obligations, even if such check is marked in any way to indicate that it is in full satisfaction or in full release of your claim, and absent written acceptance of said lesser sum from you, I consent to your immediate deposit of such check though my fiduciary and I will remain liable for the balance still due and owing with such charges and fees as may accrue until you are paid in full.

5.  The term "proceeds" shall include any money paid as a consequence of the Lawsuit whether by settlement, judgment or otherwise.

6.  LAWCASH reserves the right, at its sole and absolute discretion, to decline any advances not yet made under this agreement. This shall not affect my obligations regarding any funds which actually were advanced, including but not limited to fees and charges.

7.  I hereby waive any defense to payment of the sums due and promise not to seek to avoid payment of any money due to LAWCASH under this Agreement.

8.  I will instruct my attorney to mail all payments to:

    **Plaintiff Holding V, LLC**
    **PO Box 3027**
    **Hicksville, New York 11802-3027**

9.  I understand that the payment instructions set forth herein are irrevocable and are not subject to modification in any manner, except by LAWCASH or any successor lender so identified by them and only by written notice rescinding or modifying the payment instructions contained herein.

## SECTION 3. SECURITY INTEREST

1.  I hereby grant LAWCASH a Lien and Security Interest in the proceeds of the Lawsuit. The amount due you shall be withheld from any money collected as a result of the Lawsuit and paid immediately upon collection to LAWCASH. The amount due shall be paid immediately after my attorney fees (including the expenses charged by my attorney for costs) and after payment to any lien holders that might exist of record as of this date, or which may have priority by law. I will not receive any money from the proceeds of the Lawsuit until LAWCASH has been paid in full. This shall also apply to any structured settlement of my lawsuit. I acknowledge that any receipt or use of any funds prior to the full re-payment to LAWCASH shall constitute an illegal conversion and may well be a crime.

2.  In the event that the assignment of my interest in the proceeds of the Lawsuit is not permitted by law, then I agree to pay LAWCASH all of the funds due under this Agreement immediately upon the payment of the Lawsuit proceeds as a separate and independent obligation.

Page 2 (222834)                                              Client's Initials **JP**

3.  I hereby agree that I will not knowingly create additional liens against the proceeds without the prior written consent of LAWCASH except those as may be necessary to the prosecution of the case.  I specifically promise not to create any liens against the proceeds of the case as a result of any funding or loans that I might receive after the date of this agreement.

4.  I understand that I am not assigning my cause of action (lawsuit) to you, but rather a portion of the proceeds of the Lawsuit.

5.  I direct my attorney, and any future attorney representing me in the lawsuit, to honor this lien.  If LAWCASH must engage the services of any attorney to collect the sum due, then I will be responsible for reasonable attorneys fees and costs for such.  I agree that a fee equal to one-third of the money due LAWCASH is a reasonable fee for such purpose.  If I am required to engage an attorney to defend myself against an improper claim by LAWCASH, then the prevailing party shall be entitled to reasonable attorneys fees in an amount equal to one-third of the money that LAWCASH has wrongfully claimed.

6.  **LAWCASH SHALL HAVE NO RIGHT TO AND WILL NOT MAKE ANY DECISIONS WITH RESPECT TO THE CONDUCT OF THE UNDERLYING CIVIL ACTION OR CLAIM OR ANY SETTLEMENT OR RESOLUTION THEREOF AND THAT THE RIGHT TO MAKE THOSE DECISIONS REMAINS SOLELY WITH ME AND MY ATTORNEY IN THE CIVIL ACTION OR CLAIM.**

7.  Law Cash may, in its sole discretion, file a Uniform Commercial Code Form 1 (UCC-1) instrument in whatever jurisdiction it chooses, and notice any party it may choose, of its Security Interest and Lien and is appointed attorney in-fact solely for such purposes.

## SECTION 4.  RIGHT OF CANCELLATION

CONSUMER'S RIGHT TO CANCELLATION: YOU MAY CANCEL THIS CONTRACT WITHOUT PENALTY OR FURTHER OBLIGATION WITHIN FIVE BUSINESS DAYS FROM THE DATE YOU RECEIVE FUNDING FROM LAWCASH.  In order for the cancellation to be effective, I understand that I must return all money given to me by LAWCASH simultaneously with my rescission.  I may do this by making personal delivery to LAWCASH's offices of: (a) the undeposited (or un-cashed) check that LAWCASH gave to me; (b) a Certified or Bank check in the exact amount that LAWCASH gave me; or (c) a Money Order in the exact amount that LAWCASH gave me.  I may also mail by insured, registered or certified U.S. mail, postmarked within five (5) business days of receipt of funds from LAWCASH, a notice of cancellation together with LAWCASH's un-cashed check, or a certified or registered check or money order for the full amount of the disbursed funds

## SECTION 5.  ACCURACY OF INFORMATION

If LAWCASH should become aware that you made a material misstatement in your application or in connection with your Lawsuit, or committed a fraudulent or criminal act either in connection with this transaction, or in a matter that would adversely and significantly impact on your lawsuit (unless disclosed to us prior to funding), then you will be liable to LAWCASH for all sums advanced, together with outstanding fees and charges without regard to the outcome of your Lawsuit.  In the case of multiple findings, should LAWCASH become aware of any of the foregoing between findings, LAWCASH may, additionally, at its sole and exclusive option, discontinue any future funding.

## SECTION 6.  NOTIFICATIONS

1.  I understand that should I decide not to pursue my case I will notify LAWCASH within FIVE (5) BUSINESS DAYS of that decision.

2.  I have instructed my attorney to cooperate with you and to give you periodic updates of the status of my case as you request.  If I change attorneys, I will notify you within 48 hours of the change, and provide you with the name, address and phone number of my new attorney.  If I choose to drop my case, I will contact LAWCASH within 5 business days.

3.  I will receive any notices required at the address I have first listed above.  If I move, I will notify you within 72 hours of my new address.

## SECTION 7.  MISCELLANEOUS

1.  This Agreement constitutes the entire agreement between the parties and there are no representations, warranties, covenants or obligations except as set forth herein.  This Agreement supercedes all prior and contemporaneous agreements,

understandings, negotiations, or discussions, written or oral, of the parties hereto, relating to any transaction contemplated by the agreement, however, this Agreement does not supersede any previously execute funding agreements between the parties. This Agreement shall be binding on, and inure to the benefit of, the parties hereto and their successors and assigns.

2. In the event that there is a dispute as to the amount owed at the time that the Lawsuit is resolved, it is expressly understood that my attorney shall not disburse any funds to me, or on my behalf, except for attorney's fees and/or actual disbursements incurred by my attorney in connection with the prosecution of the Lawsuit. I hereby make the foregoing an irrevocable direction to my attorney, or his successors.

3. If any provision of this Agreement shall be deemed invalid or unenforceable, it shall not affect the validity or enforceability of any other provision hereof. This written agreement represents the entire agreement between the parties. It may only be modified in writing. This Agreement takes precedence over any prior understandings, representations or agreements.

4. Certain jurisdictions prohibit "Champerty". Basically, champerty makes it illegal for an individual or company to acquire someone else's right to sue. In entering into this agreement, the parties acknowledge that LAWCASH is in no way acquiring my right to sue; that I have already started the Lawsuit; that the Lawsuit absolutely belongs to me and no one else; and that LAWCASH will in no way be involved in the decisions that me and my attorney(s) make in connection with the Lawsuit. This is an investment and not a loan, but should a Court of competent jurisdiction construe it to be the latter, then I agree that interest shall accrue at the maximum rate permitted by law.

5. I agree that any disputes that may arise out of this Agreement shall be adjudicated in either the Supreme Court, or the Civil Court in the County of Kings. This agreement will be construed in accordance with the laws of the State of New York.  I understand that in the event that you do not receive payment as required by this Agreement and that you need to take action to pursue such payment, you may collect, in addition to the amount due and owing, reasonable attorneys fees and costs in enforcing your efforts. I agree that an amount equal to one third (33 1/3%) of the amount due and owing is a reasonable attorney's fee.  Notwithstanding the foregoing, the prevailing party in any legal action shall be entitled to reasonable attorney's fees and costs, and that one-third (33⅓%) of the sum at issue is a reasonable attorney's fee.

6. This Agreement may be executed in separate counterparts. A signature transmitted by FAX shall be effective with the same force and effect as an original signature.

7. Notwithstanding any other provision of this contract, at the sole and exclusive option of LAWCASH, any controversy or claim arising out of or relating to this contract, including without limitation the interpretation, validity, enforceability or breach thereof, shall be settled by final, binding arbitration administered by the American Arbitration Association (hereinafter referred to as "AAA") in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall be a practicing attorney or a retired judge licensed to practice in the State of New York. The parties also agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to the proceedings. The arbitrator shall award to the prevailing party, if any, as determined by the arbitrator, all of its costs and fees. "Costs and fees" mean all pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees, and attorneys' fees. The award shall be in writing, shall be signed by the arbitrator, and shall include a statement regarding the reasons for the disposition of any claim. LAWCASH may exercise its sole and exclusive option to arbitrate at any time whatsoever, unless LAWCASH has commenced a litigation or interposed a counter claim in litigation that you have commenced. This option is not waived in the event that LAWCASH interposes an Answer in an action that you have commenced.  I HEREBY EXPRESSLY WAIVE THE RIGHT TO CONSOLIDATE, OR TO HAVE HANDLED AS A CLASS ACTION, ANY PROCEEDINGS, CONTROVERSIES, ARBITRATIONS OR DISPUTES OF ANY NATURE WITH ANY PROCEEDINGS, CONTROVERSIES, ARBITRATIONS OR DISPUTES INVOLVING ANY PERSON OR ENTITY WHO IS NOT A PARTY TO THIS AGREEMENT.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

Page 4 (222834)                                               Client's Initials _JP_

12/09/2014  4:53PM  (GMT-05:00)

DocuSign Envelope ID: F4C776E6-2757-4A66-9631-DCDFB27CDAFC

A copy of this contract will be sent to both me and my attorney.

I hereby accept LAWCASH's funding as per the terms of this agreement, grant LAWCASH a Security Interest and Lien as per the terms hereof, and assign the proceeds of my lawsuit to the extent specified in this agreement on the _____ day of _____ , 2014.

**DO NOT SIGN THIS CONTRACT BEFORE YOU HAVE READ IT COMPLETELY, OR IF IT CONTAINS ANY BLANK SPACES. BEFORE YOU SIGN THIS CONTRACT YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CONTRACT.**

_Jerri Plummer_
Jerri Plummer          DL 905051347

State of   AR          )
County of  SALINE      ) ss.:

On the 9th day of December , 2014, before me personally came Jerri Plummer, (each) known to me, and known to me to be the individual (s) described in and who executed the within document and duly acknowledged to me that s/he executed the same.

_____
NOTARY PUBLIC
Trent Hollersworth
Comm.Exp 02-03-2022

DocuSign Envelope ID: F4C776E8-2757-4A66-9631-DCDFB27CDAFC

December 08, 2014

Plaintiff Funding Holding, Inc.
26 Court Street
Suite 1104
Brooklyn, NY 11242
(718) 875-0605

Re:    Client: Jerri Plummer
       Case:  Jerri Plummer for the incident that occurred on or about 06/13/2008, or any other
              related actions

Plaintiff Funding Holding Inc.:

   I am writing this letter in furtherance of my application for a non-recourse advance in
connection with my TVM claim. It is my intention to use the funds for surgery.

   I hereby certify that I have been told that this surgery is medically necessary and I am not
undergoing the surgery for any other reason. I was told this by _____
(please insert the name of the doctor or medical group).

   Thank you.

                                        _Jerri Plummer_
                                        Jerri Plummer

12/09/2014  2:50PM (GMT-05:00)